546 F.2d 255
 UNITED STATES of America, Plaintiff-Appellee,
v.
Joseph Michael SCULLY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Cirilo Mitchell BASAS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Mitchell MACEDO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Steven James SANCHEZ, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
George Enos CABRAL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Terrance Eugene MACEDO, Defendant-Appellant.
 Nos. 74-2479, 74-2295, 74-1891, 74-1887, 74-1888 and 74-1886.
 United States Court of Appeals,
Ninth Circuit.
 May 24, 1976.
Rehearings Denied in No. 74-1888 Sept. 7, 1976.
As Amended on Denial of Rehearing En Banc Oct. 26, 1976.
Judgment Vacated Feb. 28, 1977.
See 97 S.Ct. 1168.
 
 John C. Emerson, Special Atty. U. S. Dept. of Justice (argued), San Francisco, Cal., for plaintiff-appellee.
 Donal D. Cummins (argued), of Cummins, Holmes & O'Day, San Francisco, Cal., for defendant-appellant in Nos. 74-1886 and 74-1887.
 Martin D. Lurie (argued), of Hamar & Lurie, San Francisco, Cal., for defendant-appellant in No. 74-1888.
 Richard B. Mazer (argued), San Francisco, Cal., for defendant-appellant in No. 74-1891.
 Sydney N. Tanner (argued), San Francisco, Cal., for defendant-appellant in No. 74-2295.
 Timothy H. Power (argued), San Francisco, Cal., for defendant-appellant in No. 74-2479.
 Before MERRILL and TRASK, Circuit Judges, and LUCAS,* District judge.
 TRASK, Circuit Judge:
 
 
 1
 Appellants are six criminal defendants originally indicted along with 18 others for involvement in a heroin distribution ring. Thirteen of the original defendants pleaded guilty; the charges against four were dismissed; one is a fugitive. The remaining six, appellants here, were each convicted of one or more violations of federal narcotics laws for their part in the ring. They raised numerous issues on their appeals which were consolidated here.
 
 
 2
 Special Agent Sherrington of the Office of Drug Abuse Law Enforcement (then a part of the Bureau of Narcotics and Dangerous Drugs) conducted an undercover investigation of defendant Robert Macedo's drug activities from November 1972 through January 1973. During this period he made six purchases of heroin from Macedo or from Macedo's apparent intermediary.
 
 
 3
 In discussions with Sherrington, Macedo stated that he sold 10 to 24 ounces of heroin each day at a profit of $100 per ounce; that customers called him on the telephone and placed their orders for heroin; and that customers came to his residence to pick up their purchases.
 
 
 4
 As a result of this investigation the government applied for and was granted permission by United States District Judge Spencer Williams in order NDC-31 on January 31, 1973, to tap Macedo's telephone for 20 days. The application named Robert Macedo and Joseph Scully as the persons "known" to be engaged in the illegal heroin operation in violation of 18 U.S.C. § 2518(1)(b)(iv). Scully's role was disclosed in the affidavit in support of the application by means of information from an informant and information that Scully was present in Macedo's home at the time of one of the heroin sales to Sherrington. No other persons were named as "known." The order directed that there be reports to Judge Williams every 5 days on the progress being made. There was a further provision that there be a minimization of interceptions.
 
 
 5
 On February 14, 1973, the tap was concluded when Macedo moved to a new address. On February 20, 1973, Judge Williams approved another order, NDC-32, which authorized interception of conversations on Macedo's new telephone number and on Scully's phone number. Robert Macedo and Scully were again the only persons named as "known." These taps occurred between February 21, 1973, and March 12, 1973. Five-day reports and minimization were required under this order.
 
 
 6
 On March 13, 1973, Judge Williams approved order NDC-34 which permitted interception of conversations for 10 days on Scully's telephone, the interception of conversations on defendant Basas' phone, and the placement of a microphone at Basas' residence. Named as "known" were Macedo, Scully, and Basas. The Basas tap and bug were supported in part by information obtained by interceptions pursuant to the first two orders. Five-day reports and minimization were required.
 
 
 7
 On March 29, 1973, the government began arresting the members of the heroin ring as disclosed by the taps, purchases of heroin, and other facts. At this time, pursuant to search warrant, the residences of Robert Macedo and defendant Steven Sanchez were searched. Heroin and other contraband were seized at each location.
 
 
 8
 Prior to trial the district court considered various motions by defendants. After a hearing, the court found that the government should have named defendant Jewett Schetter in applications for NDC-32 and NDC-34 as an individual "known" to be engaged in the criminal enterprises. It ordered the incriminating wiretaps suppressed as to him, and the government dismissed the indictment. The court further ruled that defendant Scully with whom Schetter spoke in the intercepted calls lacked standing to raise in his own defense the violation of Schetter's rights. In a similar manner, the court ruled that three of the appellants who talked with Nancy Macedo, Robert's wife, lacked standing to assert in their defense the alleged violation of her rights by failure to name her as "known" in the application; Nancy Macedo had pleaded guilty.
 
 
 9
 A number of the appellants contended that they were "known" to be engaged in the illegal activity at the time the government filed its various applications and thus should have been named. The district court found that appellants had failed to meet their heavy burden of proof and declined to suppress the wiretaps.
 
 
 10
 The court also held a hearing on whether there was proper "minimization" of interception of innocent calls. The court limited the hearing to an examination of the instructions given by the two supervising attorneys and the agent in charge to the monitoring agents. No inquiry into the procedures actually followed on individual calls was permitted. The district court had before it all the tapes, transcripts, and a number of affidavits of the monitoring agents.
 
 
 11
 After a 7-week trial, the jury returned guilty verdicts against all defendants on all charges, except that it found Robert Macedo guilty on one count of a lesser included offense.
 
 I. The Wiretap Issues
 
 12
 We consider first the principal issue raised, the alleged violations of the wiretapping statute. Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90-351, 82 Stat. 197 (codified at 18 U.S.C. §§ 2510-2520), makes it a crime to willfully intercept any wire or oral communication except under certain specific circumstances or to willfully disclose or use the contents of any intercepted wire or oral communication except under regulated conditions. 18 U.S.C. §§ 2516-2519 detail the circumstances under which interceptions of wire or oral communications may be made and used. The principal thrust of appellants' argument is directed toward establishing that the government failed to comply with controlling statutes for wiretaps and the use of the information thereby obtained. This is not the first occasion upon which this subject has been examined by us. See United States v. Turner, 528 F.2d 143 (9th Cir. 1975); United States v. Swann, 526 F.2d 147 (9th Cir. 1975).
 
 
 13
 Robert Macedo and Scully contend there was no probable cause to name them in the NDC-31 order. The affidavit discloses the Macedo-Sherrington conversations and the purchases of heroin from Macedo and Macedo's apparent intermediary. These facts provided abundant probable cause to believe Macedo was conducting a large-scale heroin distribution ring using his telephone as a means of communication.
 
 
 14
 The affidavit also states that a confidential informant whose reliability had been demonstrated in arrests or convictions and the seizure of heroin in two prior cases generally linked Scully to illegal heroin sales. There is further related an incident in which a local police officer purchased heroin from an Amelia Miranda. Scully met Miranda in a shopping center, entered her car, drove off and parked at a dead end street, returned in the vehicle to the shopping center with Miranda, stepped out of the car, and left the scene. Miranda then passed an object on to an individual who in turn sold it to the police agent. The object was 22 ounces of heroin. In a similar manner, Scully on one occasion appeared at the Robert Macedo residence and quickly left. A short time later Sherrington purchased heroin from Macedo's apparent intermediary. These facts supply probable cause to believe that Scully was involved in the heroin distribution scheme.
 
 
 15
 Section 2518(3)(c) provides that a judge may give approval to a wiretap request if he determines "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous . . .." See also 18 U.S.C. § 2518(1)(c). The fact that Agent Sherrington was successful in making purchases from Macedo is relied upon by appellants to argue that further undercover work rather than wiretaps should have been followed. But according to the affidavits in support of the wiretaps, undercover work alone was not the complete solution to the crimes then being committed or to the identification of the perpetrators. Some of the conspirators worked principally by telephone, and ordinary surveillance could not have made them known or developed evidence by which their complicity could be established in court. Some of the informants refused to testify, and thus, without means of confirmation, their disclosures would be useless. In addition, given the extremely secretive methods used by drug dealers in general and Macedo in particular, it is highly unlikely that the government could have achieved the success it did here in uncovering this large network by further infiltration. See United States v. Pacheco, 489 F.2d 554, 564-65 (5th Cir. 1974), cert. denied, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975). Here, the district judge expressly found that normal investigative procedures had failed and reasonably appeared unlikely to succeed if continued. The challenge mounted to his decision in this regard has not been supported.
 
 
 16
 Appellants contend that the application for NDC-34 was not properly approved by the Attorney General pursuant to 18 U.S.C. § 2516(1), as required. In this case, there were documents demonstrating that the Attorney General personally approved of the NDC-34 application, although he did not do so in writing. Under United States v. Chavez, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), personal approval is all that is required to comply with section 2516(1). The statute does not require a written approval.
 
 
 17
 Appellant Sanchez contends that the unsworn, unverified file memorandum of the Attorney General does not meet the government's burden of demonstrating approval. Cf. United States v. Chavez, supra. But the affidavit of Sol Lindenbaum, Assistant to the Attorney General, states that the Attorney General approved the application in a telephone conversation with him. This affidavit is sworn to and is sufficient.
 
 
 18
 Judge Williams required the government to submit periodic reports to him on the progress being made in the wiretap investigations. Appellants contend that these reports were inadequate. Section 2518(6) provides:
 
 
 19
 "Whenever an order authorizing interception is entered pursuant to this chapter, the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the judge may require."
 
 
 20
 In United States v. Ianelli, 477 F.2d 999, 1002 (3d Cir. 1973), aff'd on other grounds, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975), the Third Circuit considered a claim that the authorizing judge abused his authority in permitting a tap to continue when he required and received only very sketchy reports. The court said:
 
 
 21
 "The sufficiency of these reports was a matter for the supervising judge, and the breadth of his discretion must be viewed in light of the fact that he could under 18 U.S.C. § 2518(6) have dispensed with progress reports entirely. We find no error." Id. at 1002. (Citation omitted.)
 
 
 22
 See United States v. Falcone, 364 F.Supp. 877, 888 (D.N.J.1973), aff'd mem., 500 F.2d 1401 (3d Cir. 1974); United States v. LaGorga, 336 F.Supp. 190, 194 (W.D.Pa.1971) (oral reports upheld).
 
 
 23
 Appellants seek to open up to consideration the alleged incompleteness of each of the many reports in light of the facts known at a later time. The reports here summarize the total number of calls intercepted, the number of calls believed to be drug related, the steps being taken to minimize interception of innocent calls, and the questions that remained unanswered on the scope of the conspiracy. Appellants seek a fruitless inquiry into the hypothetical question of what the authorizing judge might have wanted and how he might have reacted. If the judge had wanted more he could have asked. The safeguard for the government's failure to comply with 5-day report requirements is litigation of the issues of adequate minimization or failure to terminate the intercept upon achievement of the objective. These are substantive issues that a district court on considering a motion to suppress could deal with.
 
 
 24
 United States v. Chun, 503 F.2d 533 (9th Cir. 1974), relied upon by appellants, Appellants' Reply Brief 38-40, is distinguishable. There, the court found that the government had failed to carry out its duty to disclose a description of the persons whose conversations were seized so that the judge could exercise his discretion to serve inventory notice following the conclusion of the wiretaps, as required by 18 U.S.C. § 2518(8)(d). There was no disclosure of the relevant information. Here, in general terms, the government did disclose the scope and pace of its investigations. The fact that the government could have been more detailed, even though the authorizing judge did not require it, does not rise to the level, as in Chun, of a complete denial of the information the judge needed to carry out his discretionary decision.
 
 
 25
 Appellants also complain about minimization. The type of hearing that is required on the issue of proper minimization is a relatively uncharted sea. Section 2518(5) provides that every wiretap order and extension
 
 
 26
 "shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days."
 
 
 27
 Each intercept order in this case contained such a minimization provision. Under section 2518(10), an "aggrieved person" may move to suppress the wiretap evidence for failure to comply with an authorized intercept order. The courts have required the government to comply with the minimization requirement by suppressing evidence generally if there was noncompliance with the minimization requirement. E. g., United States v. George, 465 F.2d 772 (6th Cir. 1972). But see United States v. Cox, 462 F.2d 1293, 1301-02 (8th Cir. 1972), cert. denied, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974) (remedy for violation of minimization requirement is civil suit, not suppression). United States v. Giordano, 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341, 360 (1974), requires suppression when "there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures . . .." The minimization provision reflects and substantially implements Congress' intent to limit interceptions. There must be suppression if the government has failed to comply substantially with the minimization requirement.
 
 
 28
 Appellants claim that there may not have been adequate minimization. They sought a hearing in which they could examine individual monitors on individual taped conversations to question them on their reasons for listening to and recording some calls completely and terminating others. They also sought to examine the agents on the individual instructions they received from their superiors. The trial court held a minimization hearing which he limited to an examination of three witnesses, the supervising agent and two supervising attorneys, who ran and closely controlled the investigation and wiretap operations. The six defense counsel were permitted to examine these witnesses for a day on the instructions they gave the monitors in general. They were not permitted to examine on individual calls.
 
 
 29
 It is difficult to see what a wide open hearing would accomplish other than delaying the case, using up scarce judicial resources, and making wiretaps that much more cumbersome to use. The trial court had before it all the tapes, transcripts of all the tapes (apparently), the complete logs, the statistics of the government, the statistics of the defendants, affidavits of the three supervisors, affidavits of 10 of the 16 monitors of whom five heard over 80 percent of the calls, and the testimony of the three supervisors under cross-examination. The trial court maintained that it had enough written material before it to determine if the investigation was properly attentive to the minimization requirement. He had the tapes and transcripts thereof before him, and they were the best evidence of whether there was adequate minimization. Since the court was concerned if there was general and overall compliance with the minimization requirement, an open hearing would have been wasteful in the extreme. For, even though defense counsel might demonstrate a failure to minimize as to a handful of calls by cross-examining the monitors, this would not require any suppression if there was overall compliance with the minimization requirement. The logic of defendants' position is that a minimization examination on every call would be necessary. With over 1500 calls seized, this is an impossible task. Therefore it appears that the trial court acted within the bounds of its discretion. Rule 12(b)(4) of the Federal Rules of Criminal Procedure states:
 
 
 30
 "All other issues of fact (issues not required by statute or the Constitution to be decided by the jury) shall be determined by the court with or without a jury or on affidavits or in such other manner as the court may direct."
 
 
 31
 Appellants Cabral, Basas, and Terrance Macedo contend that the government did not comply with the provisions of the wiretap statute in that they were persons "known" to be engaged in the heroin scheme but were not named in the various wiretap applications and orders.
 
 Section 2518 provides:
 
 32
 "(1) Each application for an order . . . shall include the following information:
 
 
 33
 "(a) the identity of the investigative or law enforcement officer making the application and the officer authorizing the application;
 
 
 34
 "(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including . . . (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;
 
 
 35
 "(4) Each order authorizing or approving the interception of any wire or oral communication shall specify
 
 
 36
 "(a) the identity of the person, if known, whose communications are to be intercepted . . .."
 
 
 37
 The attempt to apply subsections 2518(1)(b)(iv) and (4)(a) and properly identify those persons "if known" who must be specified in the application and in the order has been the subject of much concern. The Supreme Court considered it in United States v. Kahn, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974), rev'g 471 F.2d 191 (7th Cir. 1972). The Court of Appeals in Kahn construed the phrase "if known" as not embracing those "persons whom careful investigation by the government would disclose were probably using the Kahn telephones in conversations for illegal activities." 471 F.2d at 196. The Supreme Court had a different view and reversed. Going back to the critical portion of the statute, it pointed out that:
 
 
 38
 "The sole provision pertaining to the identification of persons whose communications are to be intercepted is contained in § 2518(1)(b)(iv), which requires that the application state 'the identity of the person, if known, committing the offense and whose communications are to be intercepted.' (Emphasis supplied.) This statutory language would plainly seem to require the naming of a specific person in the wiretap application only when law enforcement officials believe that such an individual is actually committing one of the offenses specified in 18 U.S.C. § 2516." 415 U.S. at 152, 94 S.Ct. at 982, 39 L.Ed.2d at 235.
 
 
 39
 The Court observed that a proper reading of the statutory language would not require an identification of "all persons known or discoverable" but must necessarily be restricted to those (1) "known" and (2) who are "committing the offense." Id. at 15253, 94 S.Ct. at 982, 39 L.Ed.2d at 235. It concluded, therefore, that Title III requires:
 
 
 40
 "(T)he naming of a person in the application or interception order only when the law enforcement authorities have probable cause to believe that that individual is 'committing the offense' for which the wiretap is sought." Id. at 155, 94 S.Ct. at 984, 39 L.Ed.2d at 237.
 
 
 41
 Even with such careful guidance, the pathway has not been obvious for the Courts of Appeals. A panel of the Fifth Circuit in United States v. Doolittle, 507 F.2d 1368 (5th Cir. 1975), arrived at a divided result. The majority upheld the government's contention that probable cause in this instance meant personal knowledge as opposed to information and that when coupled with good faith and absence of subterfuge, substantial compliance was achieved. Id. at 1371-72. The failure to name other defendants did not render the evidence obtained as to them inadmissible. The dissent measured the requirement by the ordinary tests of probable cause based upon the facts disclosed at the time of the application. Id. at 1373 (Thornberry, J.). On rehearing en banc, United States v. Doolittle, 518 F.2d 500 (5th Cir. 1975), the majority sustained the original panel's view, but with a substantial minority joining the panel dissent and with a third view expressed that the statute required the naming of all those individuals "against whom the interception was directed." Id. at 503 (Godbold, J., dissenting).
 
 
 42
 The Fourth Circuit[1] looks at the problem more directly, it appears to us, and says,
 
 
 43
 "We therefore hold that when there is probable cause to believe that an individual is committing a specific crime and may be overheard on a specific phone, he is known to the government for the purpose of § 2518(1)(b)(iv)." United States v. Bernstein, 509 F.2d 996, 1002 (4th Cir. 1975).
 
 
 44
 In United States v. Donovan, 513 F.2d 337 (6th Cir. 1975), cert. granted, 424 U.S. 907, 96 S.Ct. 1100, 47 L.Ed.2d 310 (1976) (No. 75-212), the names of two men concededly committing the offense were known but not specified and a third about whom the applicant said he had "suspicions" was likewise undesignated. The wiretap testimony of all three was suppressed.
 
 
 45
 United States v. Chiarizio, 525 F.2d 289 (2d Cir. 1975), aff'g 388 F.Supp. 858 (D.Conn.1975), adopts the rule that probable cause must be found before a duty to identify and specify an individual in the application and order comes into being. 525 F.2d at 292. There the trial court, after a 2-day evidentiary hearing, credited the government's witnesses and found that the government's applicant for the order did not in fact possess sufficient information at the time of the application to establish probable cause for the defendant in question. The evidence was thus held admissible.
 
 
 46
 We read the statute and the decision of the Supreme Court in Kahn to mean what the plain language says. When the law enforcement authorities have probable cause to believe that the individual is committing the offense for which the wiretap is sought, that individual must be named. United States v. Kahn, 415 U.S. at 155, 94 S.Ct. 977, 39 L.Ed.2d 225. Probable cause we define in the traditional terms "whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the (particular individual) had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142, 145 (1965); see United States v. Walling, 486 F.2d 229, 236 (9th Cir. 1973). In a doubtful case, it is, of course, for the trial court to decide the issue.
 
 
 47
 The district court required a two-step approach. Even if probable cause was shown, the trial court held that the defendants must also come forward with evidence that is "strong and clear, not questionable . . . a showing being tantamount to demonstrating a conscious disregard to the dictates of Title III" in order to obtain suppression of the wiretap evidence. We find no support in Kahn or the statute for this additional gloss on the rule and therefore reject it.
 
 
 48
 Thus, we turn to the evidence available to the applicant at the time the application for a wiretap was filed to determine the extent of his knowledge in terms of probable cause. The three appellants whose wiretap evidence is in question are Cabral, Basas, and Terrance Macedo.
 
 
 49
 (1) Cabral. No argument is made by Cabral that probable cause existed to believe he was committing a crime prior to the first wiretap application on January 31, 1973. This was the NDC-31 tap. He does point out that during the period of this tap (January 31 to February 20, 1973), he was sufficiently identified by surveillance information and interceptions of the Robert Macedo telephone to bring him within the probable cause standard. It is undisputed that the wiretap of Macedo's phone under NDC-31 picked up several outgoing calls to a "George." Telephone records in the possession of the supervisors showed the phone as subscribed to "George Cabral." This established probable cause to believe that an individual using the name "George Cabral" was involved in illegal heroin activities and engaged in conversations with persons at Robert Macedo's phone.
 
 
 50
 As we have said in United States v. Chun, supra at 536-38, a failure to name may not under every circumstance require suppression of wiretap information. The omission must be measured not only in light of constitutional limitations, but also against the standards and requirements of Title III of the Act. Our examination of the former leads us to the conclusion that neither the notice procedures nor the procedures for the return on the warrant, see Berger v. New York, 388 U.S. 41, 58-60, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), violated the Fourth Amendment rights of Cabral. He does not argue the constitutional question. Cabral does, however, strenuously urge that his statutory rights have been violated by not having been "named" in the order authorizing the taps. We find that as to the second tap, NDC-32, he should have been so named.
 
 
 51
 Every violation, however, does not automatically require suppression of the evidence. It must further appear that the procedure which has been violated is a central or functional safeguard in the statutory scheme to prevent abuses, United States v. Chavez, supra, 416 U.S. at 578, 94 S.Ct. 1849, 40 L.Ed.2d 380; United States v. Giordano, supra, 416 U.S. at 526-27, 94 S.Ct. 1820, 40 L.Ed.2d 341; United States v. Chun, supra at 542, and it also must be determined whether the purpose which the procedure was designed to accomplish has been satisfied in spite of the error. United States v. Chavez, supra, 416 U.S. at 573-74, 94 S.Ct. 18-49, 40 L.Ed.2d 380; United States v. Giordano, supra, 416 U.S. at 524-29, 94 S.Ct. 1849, 40 L.Ed.2d 380; United States v. Chun, supra at 542. For example, the preliminary approval of wiretap applications by the Attorney General under section 2516(1) is such a functional safeguard; on the other hand, where the preliminary approval has been properly obtained, failure to correctly report the identity of the person authorizing the application (§§ 2518(1)(a), (4)(d)) does not require suppression. United States v. Chavez, supra, 416 U.S. at 571-72, 94 S.Ct. 1849, 40 L.Ed.2d 380. In this case, the naming of a person in the application or interception order when known is required "only when the law enforcement authorities have probable cause to believe that that individual is 'committing the offense' for which the wiretap is sought." United States v. Kahn, supra, 415 U.S. at 155, 94 S.Ct. 984, 39 L.Ed.2d 237. It would appear that this requirement is crucial in the statutory scheme and that its violation in the circumstances described requires suppression. United States v. Donovan, supra at 340-41; United States v. Bernstein, supra at 1000-01.
 
 
 52
 Cabral contends that because the first possible identification occurred on February 7, 1973, that all further conversations during the NDC-31 authorization should be suppressed. We disagree. Although suspicions were aroused which later appeared to be well founded, the rule does not require termination in the middle of a conversation. The tap of NDC-31 had been properly authorized; it was entitled to be completed. It is clear, however, that in the two subsequent applications Cabral should have been named and specified. He was not, and any evidence secured through the latter two taps should accordingly have been suppressed.
 
 
 53
 (2) Basas. Basas was named in NDC-34, but he claims that he was known and should have been named in NDC-31 and NDC-32. In the affidavit of Special Agent Siegel in support of the NDC-34 application, there is contained information reported by Detective Guzman of the Union City, California, Police Department to Agent Siegel. According to Guzman, confidential and reliable informants reported that Basas was engaged in heroin dealings. There was information linking Basas to Scully, showing Basas as Scully's supplier of heroin. In NDC-32, the Justice Department received authorization to tap Scully's phone in part to intercept calls from Scully to his unknown supplier. This information, were it known to the supervisors of this investigation prior to the application for NDC-32, would have established that more probably than not Basas would be using Scully's phone for illegal heroin dealing.
 
 
 54
 The facts do not support a similar finding as to NDC-31. Except for a statement by Robert Macedo to one of the informants that Basas was a big heroin dealer, the NDC-31 affidavit does not link Basas with Macedo or provide information that Basas would be using Macedo's phone to conduct his operations. In the absence of a link between Basas and Macedo's phone, there could be no requirement that Basas be named in the NDC-31 application and order, which was limited solely to Macedo's phone. 18 U.S.C. §§ 2518(1)(b) (iv), (4)(a).
 
 
 55
 While the subsequent information from Detective Guzman would have provided probable cause to believe Basas would be communicating over Scully's phone in furtherance of his criminal designs, it is not possible on the state of the record to determine whether probable cause existed at the time of the application for NDC-32. The affidavit of Agent Siegel does not state when Detective Guzman communicated his information, and the examination of Agent Siegel at the hearing to suppress did not elicit this information.
 
 
 56
 We therefore conclude that the attack upon the two earlier wiretaps by Basas was not sustained. Basas was of course specified in NDC-34.
 
 
 57
 (3) Terrance Macedo. Undercover Agent Sherrington had been working on this case for some four or five months prior to the first application for a wire tap. He had made six direct purchases of heroin and learned of some individuals that he knew were involved and some that he suspected were involved. He had developed about as much information as he could. At the pretrial hearing on the Kahn issue, he testified that from what he had been told he "felt" that Terrance Macedo was definitely involved in the drug traffic. R.T. at 247. A lengthy cross-examination, however, developed little more than that he had become suspicious. R.T. at 247-261. Special Agent McKulsky, another investigative official on the case, testified that he had heard the name Terrance Macedo in monitoring calls. When asked what he did about it, McKulsky answered: "I didn't do very much, because he wasn't really who I was focusing on." R.T. at 266-67.
 
 
 58
 The two persons who put together the application to be presented to the judge were the case agent Robert Siegel and the Justice Department lawyer Jack C. O'Donnell. Siegel prepared the affidavit upon which the application for wiretap was made, and O'Donnell prepared the application itself. The district court in its evidentiary hearing on the Kahn issue had both the agent and the lawyer before it and made them available for cross-examination. Where so much depends on demeanor and credibility of witnesses and the inferences to be drawn from reports and guarded telephone conversations, we cannot say that the trial court was in error in refusing to suppress the evidence as to Terrance Macedo.[2]
 
 
 59
 Lawyer O'Donnell, who prepared the application and testified that he helped draft the affidavit and the application on NDC-32, was available on cross-examination for all defense counsel and was examined. He testified he worked with Siegel as to the basic data available. He was asked directly what information he had available to him at the time he prepared the application for NDC-32:
 
 
 60
 "A. (Mr. O'Donnell) I am not even sure that I knew him by his full name. I know there was some calls relating to a Terry. They were outgoing calls to, I believe, R. A. Macedo. But other than that they didn't appear at that time to, as I recall it, to relate to illegal narcotics activity.
 
 
 61
 "Q. (Mr. Field) Now in preparation for coming to court, have you reviewed the agents' notes and the transcripts of those calls that have since been attributed to Terry Macedo and occurred during NDC-31?
 
 
 62
 "A. (Mr. O'Donnell) Yes.
 
 
 63
 "Q. (Mr. Field) Now, did you name Terry Macedo in the application for the proposed order for NDC-32?
 
 
 64
 "A. (Mr. O'Donnell) No. I did not.
 
 
 65
 "Q. (Mr. Field) After, can you state why you did not?
 
 
 66
 "A. (Mr. O'Donnell) I did not feel there was any probable cause in regard to him.
 
 
 67
 "Q. (Mr. Field) And would that be probable cause, probable cause with regard to what?
 
 
 68
 "A. (Mr. O'Donnell) His involvement at that time in the conspiracy."
 
 
 69
 R.T. at 297-98.
 
 
 70
 There was no question raised in the briefs as to the validity of the NDC-34 tap as to Terrance Macedo. We thus conclude that there was no violation of section 2518(1)(b)(iv) because of the failure of the applications in question to name Basas and Terrance Macedo.
 
 
 71
 We next consider the "standing" contentions of appellants. The district court ruled that the conversations of Jewett Schetter were unlawfully seized because he was a person "known " to be engaged in illegal drug activities and yet was not named in the applications for NDC-32 and NDC-34 as to Scully's phone. The government dismissed the Schetter indictments and does not contest this ruling. Scully who was a party to those conversations contends that they were also inadmissible against him. Appellants further argue that Nancy Macedo was also one "known" but not named and that the conversations were inadmissible as to her. Since Nancy Macedo pleaded guilty to the charges against her, she never raised and litigated the issue. Most of the appellants at some time or other had conversations with Nancy Macedo, Robert Macedo's wife, and those conversations were admitted against them. Scully had incriminating conversations with Schetter, and they were admitted against him. The district court ruled that there was no standing for one a party to an overheard conversation to raise the rights of the other party that the wiretap was illegal as to the second party and thus should not be used against the first party.
 
 
 72
 The district court was correct. Appellants argue from a too literal reading of the statute. Section 2518(10)(a) gives an "aggrieved party" standing to
 
 
 73
 "move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that
 
 
 74
 "(i) the communication was unlawfully intercepted; . . . "
 
 Section 2510(11) provides that:
 
 75
 " 'aggrieved person' means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed."
 
 
 76
 Appellants simply argue that since they were parties to intercepted conversations (or targets of the investigation) they can have suppressed those conversations that were illegally intercepted because Nancy Macedo or Schetter were not named.
 
 
 77
 For purposes of discussion, it must be assumed that as to appellants' personal rights the seizures were otherwise legal. Therefore, we have the unusual case of a conversation legally seized as to an appellant and illegally seized as to Nancy Macedo or Schetter the other party in these conversations.
 
 
 78
 Congress did not intend to expand existing standing doctrines by the passage of Title III. United States v. Bellosi, 501 F.2d 833, 842 n.22 (D.C.Cir.1974); United States v. King, 478 F.2d 494, 506 (9th Cir.), cert. denied, 414 U.S. 846, 94 S.Ct. 111, 38 L.Ed.2d 94 (1973). Therefore, pre-Title III standing law determines whether these appellants can assert this defense. In Alderman v. United States, 394 U.S. 165, 171-72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the Supreme Court stated:
 
 
 79
 "The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence."
 
 
 80
 Alderman, supra at 173, 89 S.Ct. at 965, 22 L.Ed.2d at 185, quoted with approval the following language from Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 497 (1960):
 
 
 81
 "Ordinarily, then, it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy."
 
 The Alderman Court went on to say:
 
 82
 "We adhere to these cases and to the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." 394 U.S. at 174, 89 S.Ct. at 967, 22 L.Ed.2d at 187.
 
 
 83
 The appellants' personal privacy rights here were not violated because as to them the tapes were legal. Although under the statute, 18 U.S.C. § 2510(11) they were "aggrieved persons" as parties to the conversation for purposes of asserting a motion to suppress, they had no "standing" to urge in support of that motion that the rights of the other parties to the conversation were being violated.
 
 II. Other Issues
 A. The Search Warrants
 
 84
 Appellants Sanchez and Robert Macedo contend that the 210-page affidavit in support of the search warrants of their homes was insufficient. In the telephone conversations reported, there is evident a continuing relationship with defendant Scully from February 24, 1973, through March 10, 1973, in which arrangements are made to buy and sell drugs. These calls are made from or to or refer to the Sanchez residence which was searched. There was probable cause to believe that drugs would be in the subject dwelling.
 
 
 85
 As to Macedo, there were approximately 100 calls to and from his residence relating to drug purchases. One call was of a female at the Macedo residence talking with a male friend in which she says Robert Macedo showed her a large ball of pure heroin.
 
 
 86
 There is no merit to the contention that the information was stale since the calls disclosed a continuing business.
 
 
 87
 Appellants' contention that the affidavit was executed after the search warrant was approved appears to mistake the affidavit in support of arrest warrants for the affidavit in support of the search warrants. The search warrant affidavit was executed the day the search warrants were granted.
 
 B. Severance of Trial
 
 88
 Appellants Sanchez and Terrance Macedo argue that the trial court should be reversed for failing to sever their cases from the trial of the rest of the defendants. A defendant must demonstrate an abuse of discretion and resulting prejudice from a trial court's refusal to order severance. United States v. Berlin, 472 F.2d 13, 15 (9th Cir. 1973). The evidence showed that they were important parts of the conspiracy. They were not minor figures swept along to a guilty determination by the jury because of the massive proof of guilt of other conspirators. They have shown no abuse of discretion.
 
 C. Admission of the Tapes into Evidence
 
 89
 Appellants make two general arguments against the admission of all the tapes: (1) they were not properly authenticated; and (2) gaps and alterations in the tapes demonstrate that the procedure used by the government did not adequately protect the integrity of the tapes as required by 18 U.S.C. § 2518(8)(a). The appellants also make arguments that the voices on the tapes were not authenticated as those of the defendants. See part D. infra.
 
 
 90
 (1) Authentication in General. At trial there was extensive testimony on the elaborate procedures used to record the conversations on four simultaneously operating tape recorders. One set of tapes was removed from the machine, sealed, stored in a foot locker under lock, and turned over to Judge Williams, where it was sealed again. The monitoring agents kept logs on each telephone call. At trial, 10 of the 16 monitoring agents testified as to the procedures they followed. There was not, however, any testimony by the agents as to each of the 396 conversations admitted into evidence that a particular agent had listened to the call and that the tape accurately reproduced the conversation. Thus, the tapes were generally, but not specifically, authenticated.
 
 
 91
 Such a procedure appears proper. A prima facie case that the tapes were what the government said they were was made out by the proof adduced on the procedures followed. On review, this Court is limited to corrections of abuse of judicial discretion by the trial court in finding a prima facie case that the evidence is what the proponent says it is and turning the issue over to the jury for the final determination. Carbo v. United States, 314 F.2d 718, 743 (9th Cir. 1963), cert. denied, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). There is no apparent abuse here. Cf. Fed.R.Evid. 901(a).
 
 
 92
 There was also no error in allowing the government to produce a single master tape of all the conversations it intended to use and to introduce the master along with the originals into evidence. The procedure saved considerable time by eliminating the need to switch tape reels continually. The master tape had quality equal to the originals. The defendants had opportunity to examine the originals. United States v. Madda, 345 F.2d 400, 402-03 (7th Cir. 1965), permitted the use of a duplicate tape that was produced to increase the clarity of the originals. United States v. Lawson, 347 F.Supp. 144 (E.D.Pa.1972), approved of the use of a duplicate tape procedure similar to the one here in issue.
 
 
 93
 (2) Gaps and Alterations. There was testimony by two experts, one for the government and one for the defendants, on certain alleged alterations on the original tapes sealed by the court. The experts disagreed, and the trial court admitted the evidence. The elaborate procedure the government claims it followed appears to have complied with the sealing requirement of section 2518(8)(a). It is a fact question, decided adversely to appellants, whether this procedure was in fact followed.
 
 
 94
 D. Authentication of the Tapes as to Individual Defendants
 
 
 95
 Appellants argue that the government did not produce sufficient evidence to identify the speakers in the telephone conversations. Agent Siegel identified the voices of Scully and Basas on the tapes from his personal conversations with them and from other occasions he had heard them speak. This is sufficient authentication. United States v. Cox, 449 F.2d 679, 690 (10th Cir.), cert. denied, 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972); United States v. Alper, 449 F.2d 1223, 1229 (3d Cir. 1971), cert. denied, 405 U.S. 988, 92 S.Ct. 1248, 31 L.Ed.2d 453 (1972). Robert Macedo's voice on the tape was identified by Agent Siegel from comparison to a different tape played in court earlier and authenticated then.
 
 
 96
 The government attempted to authenticate the voices of the other three defendants by circumstantial evidence. As to George Cabral there was testimony that a person who identified himself as "George" had certain conversations on the telephone which were recorded. The person who called himself "George" was using the telephone at the residence where George Cabral lived. As to Steven Sanchez and Terrance Macedo, there was testimony that on a number of occasions persons who identified themselves as "Steve" or "Terry" made or received calls from residences where Sanchez and Macedo respectively lived. The telephone number tied to the "Steve" calls was subscribed for by Steven J. Sanchez. The telephone number tied to the "Terry" calls was subscribed for by R. A. Macedo. This circumstantial evidence is sufficient to meet the prima facie test of authenticity of Carbo v. United States, supra at 718. See United States v. Cox, supra at 689-90; Palos v. United States, 416 F.2d 438, 440 (5th Cir.), cert. denied, 397 U.S. 980, 90 S.Ct. 1107, 25 L.Ed.2d 391 (1969).
 
 
 97
 E. Foundation for Physical Evidence Against Robert Macedo
 
 
 98
 Appellant Robert Macedo contends that the heroin and amphetamine tablet evidence was improperly admitted since Special Agent Shaw who testified did not personally find the items but rather was giving hearsay testimony from other agents who found the items. The record shows that Agent Shaw personally seized the items from the places where they were discovered, although other agents discovered the items and called them to Shaw's attention. There is no merit to this argument.
 
 
 99
 F. Authentication of Copy of NLC-31 Affidavit
 
 
 100
 The trial court properly followed 28 U.S.C. § 1735(b) to authenticate the lost affidavit in support of NDC-31. The agent who originally signed the affidavit examined the copy and testified that it appeared to be an accurate copy of the original. There was no objection to this procedure at trial.G. Proof Aliunde of Involvement of Each Defendant
 
 
 101
 Appellants contend that the government failed to meet its burden of proving by independent evidence that a conspiracy existed and that each defendant was a part of the conspiracy. Mayola v. United States, 71 F.2d 65 (9th Cir. 1934). The hearsay statement of a coconspirator that defendant X is a member of the conspiracy is not sufficient to prove X is a member. But the words of each defendant, admitted into evidence in the wiretap tapes and properly authenticated, constitute admissions by the defendants that satisfy the independent evidence requirement. Klein v. United States, 472 F.2d 847, 850 (9th Cir. 1973). Here, each defendant was recorded in conversations involving arrangements for the sale or transportation of heroin. The statements of the other parties to the conversations are being used to give meaning to the admissions of the defendants and not, as to this requirement, to provide substantive evidence of the defendants' participation in the conspiracy. There was adequate independent evidence to link each defendant to the conspiracy.
 
 
 102
 The conspiracy itself was amply demonstrated by the furtive movements of various defendants, the guarded conversations of defendants, the actual sale of heroin to Special Agent Sherrington and two other officers, and the seizure of drugs when the search was executed.
 
 
 103
 H. Trial Court Instructions on "Minimization" and Conspiracy
 
 
 104
 The trial court's jury instruction on the meaning of the term "minimization," in light of the fact that the term had come up frequently during the trial, was perfectly proper. No one objected to the instruction at the time. Basas stretches to argue that the trial judge was in effect instructing the jury that the tapes in fact were criminal in content. The court made it clear that it was for the jury to decide what was the import of the conversations.
 
 
 105
 As to instruction 25 on conspiracy, there was no objection made when the instruction was discussed with the court, or when given to the jury. This court can reverse only for plain error when an instruction was not properly objected to in the lower court. United States v. Lipsey, 438 F.2d 974 (9th Cir.) (per curiam), cert. denied, 404 U.S. 824, 92 S.Ct. 50, 30 L.Ed.2d 52 (1971). The complained-against words read:
 
 
 106
 "Now, the commission of the overt acts may constitute the best evidence of the conspiracy and evidence is often used for that purpose." R.T. 3611-12.
 
 
 107
 Appellant Robert Macedo's objection to this language is that it reflects the theory that a recording of a defendant's words can be used to show his participation in a conspiracy, which Macedo contends is erroneous. On the contrary, this theory is sound. See part G. supra.
 
 I. Sufficiency of the Evidence
 
 108
 From an examination of the evidence in these cases, it is clear that there was more than sufficient evidence to take the cases to the jury.
 
 
 109
 The judgments are affirmed as to all appellants except as to appellant George Cabral. The judgment as to Cabral is reversed and the cause remanded to the district court for further proceedings in the light of this opinion.
 
 
 110
 A request for en banc consideration having been made by an active member of the court, and the matter submitted to all of the active judges, the request was rejected by a majority thereof. An order was thereupon entered denying en banc consideration. Judge Hufstedler files the following dissent from that order, in which Judge Ely joins.
 
 
 111
 HUFSTEDLER, Circuit Judge, dissenting from rejection of en banc hearing, in which Circuit Judge ELY concurs:
 
 
 112
 The panel's decision about the showing necessary to satisfy the requirements of 18 U.S.C. § 2518(1)(c) directly conflicts with United States v. Kalustian (9th Cir. 1975) 529 F.2d 585. A comparison of the affidavits in the two cases reveals no significant differences between them that could possibly justify contrary results.[1] The failure to en banc this case to eradicate the conflict is an abdication of our responsibility to keep the law of our circuit in order.
 
 
 113
 The panel's decision also creates intercircuit conflict on the question of standing to challenge illegal electronic surveillance. United States v. Bellosi (1974) 163 U.S.App.D.C. 273, 501 F.2d 833, correctly applied the "unambiguous criterion of standing set forth in Sections 2518(10)(a) and 2510(11)" (501 F.2d at 842) to include as "persons aggrieved" those whose conversations were intercepted even though they were not the persons against whom the electronic surveillance was directed. Section 2510(11) provides that an " 'aggrieved person' means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." The panel's reliance on Alderman v. United States (1969) 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 and Jones v. United States (1960) 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, is misplaced. Those decisions are simply irrelevant to the statutory scheme with which we are dealing; both of them are concerned with rights asserted under the Fourth Amendment and not with the interpretation of Section 2510(11).
 
 
 
 *
 Honorable Malcolm M. Lucas, United States District Judge, for the Central District of California, sitting by designation
 
 
 [1]
 United States v. Bernstein, 509 F.2d 996 (4th Cir. 1975)
 
 
 [2]
 The trial court at the evidentiary hearing considered much oral and documentary evidence concerning the three individuals in question, including the following:
 "THE COURT: Why didn't you list Terrance Macedo to be covered by the taps?
 "THE WITNESS (Siegel): I didn't believe he was directly involved in the undercover activities of which Agent Sherrington was currently involved with Robert Macedo.
 (MR. CUMMINS for Terrance Macedo:) "My question is: Why wasn't he named in the application for NDC-32, because in addition to the information you already had about him on 31, which would also include previous criminal things on his rap sheets, you at this point now had several intercepted telephone calls, some of which, not all, some of which were highlighted with the asterisk.
 "Now why at that point wouldn't he have been named?
 "A. (Siegel) The fact that there was an asterisk placed beside those particular calls doesn't have any connection with whether or not he should be placed on the affidavit.
 "Q. (Mr. Cummins) Well, it's a nonpersonal call, and in the sense of this particular wiretap you only listened to calls that were criminally related, or what the agent feels is somehow related to criminal activity under the investigation, and those calls are marked with an asterisk. Now, there are calls that involved Terrance Macedo either directly as one of the participants or in other cases he is referred to by the actual participants in the phone call. Several, in fact, most of the calls that involve Terrance Macedo in either way are marked with an asterisk to indicate that significant activity.
 "Now, coupled with what you already knew about Macedo through the undercover activities of Sherrington, through surveillance reports that were available to you, in specifically I believe February 6th and 7th, that a part of the affidavit I beg your pardon, a part of the affidavit on the search warrant, the calls that you have from NDC-31, why then wasn't he named in 32? You knew who he was.
 "A. (Siegel) The only thing I can say is we were trying to collect enough probable cause to obtain authorization to go onto another telephone. And his particular calls weren't relevant.
 "Q. (Mr. Cummins) So, you just didn't consider Terrance Macedo in this, in the application for 32?
 "A. (Siegel) I didn't."
 R.T. at 291-92.
 
 
 [1]
 In Kalustian, the affidavit stated in pertinent part:
 "The informants named herein have all said that they will not testify to information they have provided, even if granted immunity.
 "Experience has further established that even though telephone toll records are available which indicate a person is engaged in illicit gambling, the records themselves are not sufficient to prove the gambling activities. Standard investigative techniques have not succeeded in providing evidence to sustain prosecution in this case and would only succeed to a limited degree in establishing that (named defendants), and others as yet unknown, are involved in gambling activities over the telephone subscribed to in the name of the Topper Club.
 "Furthermore, such investigative techniques as physical surveillance and the records obtainable on (named defendants), and others as yet unknown, contain little probability of success in securing presentable evidence. Based upon my knowledge and experience as a Special Agent of the Federal Bureau of Investigation in the investigation of gambling cases and my association with other Special Agents who have conducted investigation of gambling activities, normal investigative procedures appear to be unlikely to succeed in establishing that the above individuals are involved in gambling activities over the aforementioned telephones in violation of Federal laws. My experience and the experience of other Agents has shown that gambling raids and searches of gamblers and gambling establishments have not, in the past, resulted in the gathering of physical or other evidence to prove all elements of the offense. I have found through my experience and the experience of other Special Agents, who have worked on gambling cases, that gamblers frequently do not keep permanent records. If such records have been maintained, gamblers, immediately prior to or during a physical search, sometimes destroy the records. Additionally, records that have been seized in past gambling cases have generally not been sufficient to establish elements of Federal offenses because such records are difficult to interpret, and many times are of little or no significance without further knowledge of the gamblers' activities. Therefore, the interception of these telephone communications is the only available method of investigation which has a reasonable likelihood of securing the evidence necessary to prove violation of these statutes." Kalustian at 587-588.
 In the present case the affidavits stated in pertinent part:
 "Based on my knowledge and experience as a Special Agent of the Bureau of Narcotics and Dangerous Drugs of narcotics cases and association with other Special Agents who have conducted investigations of illegal narcotics trafficking, normal investigative procedures appear unlikely to succeed if continued in providing prosecutable evidence. . . .
 "My experience and the experience of other Special Agents of the Bureau of Narcotics and Dangerous Drugs has shown that individuals dealing in large quantities of narcotics are particularly covert in their activities and wary of surveillance by Federal and state law enforcement personnel. Such dealers very rarely keep records, deal personally with a few trusted individuals, and isolate themselves from other individuals in the distribution organization. These same individuals receive, store and deliver narcotics at varying locations in order to avoid detection.
 "At this time there is no known undercover access to Joseph Michael Scully and it is not likely that such access will ever be developed. The confidential informants referred to in this affidavit have all refused to testify against any of the members of the organization mentioned because of fear and their personal safety. Attempts to conduct surveillance of Scully have been unsuccessful because of his constant alertness to police surveillance." Affidavit in support of application for wiretap in NDC-31 at pages 14-15.
 As in Kalustian, the affidavit is conclusionary and provides no facts upon which the judge can base his decision. The affidavit in this case is indistinguishable from the affidavit in Kalustian upon which that panel commented:
 "The affidavit does not enlighten us as to why this gambling case presented any investigative problems which were distinguishable in nature or degree from any other gambling case. In effect the Government's position is that all gambling conspiracies are tough to crack, so the Government need show only the probability that illegal gambling is afoot to justify electronic surveillance. Title III does not support that view."
 Kalustian at 589.
 The panel ruled that the affidavit did not satisfy the requirements of the statute.