549 F.2d 705
 UNITED STATES of America, Plaintiff-Appellee,
v.
Attilio Joe SPAGNUOLO, Thomas Guy Guglielmi, Charles Francis
Leahy, Kenneth Whiteman, Reginald Frederick Sutter, Howard
Arthur Swann, Michael Joseph Saunders, Raymond Zachary Cohn,
Stephen Cosenza, Armando Cosenza, Laurie Anderson Rossetti,
Gloria Spagnuolo, and Harvey Lee Ubhoff, Defendants-Appellants.
 Nos. 76-2372, 76-2037, 76-2059, 76-2060, 76-2061, 76-2062,
76-2181, 76-2458, 76-2459, 76-2460, 76-2461,
76-2462 and 76-2463.
 United States Court of Appeals,
Ninth Circuit.
 March 4, 1977.
 
 James F. Hewitt, Federal Public Defender, George L. Cooke, Edward B. Collins, Jerrold M. Ladar, George J. Engler, San Francisco, Cal., for defendants-appellants.
 James L. Browning, Jr., U. S. Atty., John C. Emerson, Sp. Atty., U. S. Dept. of Justice, San Francisco, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before BARNES, DUNIWAY and SNEED, Circuit Judges.
 OPINION
 SNEED, Circuit Judge:
 
 
 1
 This opinion marks the second time these parties have appeared before us to dispute the legality of evidence derived from a series of wiretaps authorized pursuant to 18 U.S.C. §§ 2510 et seq. In the first appeal, the Government successfully challenged the district court's suppression of this evidence. United States v. Spagnuolo, 515 F.2d 818 (9th Cir. 1975). At the subsequent trial, appellants Attilio Joe Spagnuolo, Stephen Cosenza and Armando Cosenza were convicted of conducting an illegal gambling business from September 30, 1971, to October 15, 1971, in violation of 18 U.S.C. §§ 1955 and 2 (Count I); all of the appellants with the exception of Stephen Cosenza were convicted under the same statutes of conducting an illegal gambling business from January 17, 1972, to January 9, 1973. (Count II). Tapes of conversations derived from the challenged wiretaps constituted the bulk of the Government's evidence. On this appeal, appellants argue that (1) the affidavits accompanying the applications for such authorizations did not comply with 18 U.S.C. § 2518(1) (c); (2) evidence derived from illegal wiretaps tainted the probable cause allegations in the affidavits; and, (3) the trial court should have compelled the Government to disclose certain F.B.I. investigative files. We affirm the Count II convictions and reverse the Count I convictions and remand for further proceedings with respect thereto.
 
 
 2
 I. Facts and History of These Prosecutions.
 
 
 3
 To understand this case it is necessary to refer to the seven wiretaps involved by using alphabetical designations. The first four wiretaps, which are designated as wiretaps A, B, C and D, shall be referred to collectively as "Count I wiretaps."
 
 
 4
 Wiretaps E, F and G, authorized on the basis of correspondingly lettered affidavits, supplied evidence relevant to the Count II convictions and evidence derived from each was introduced to obtain these convictions. Their collective designation is "Count II wiretaps."
 
 
 5
 The Count I wiretaps, installed during the fall of 1971, were the culmination of an investigation headed by F.B.I. Agent Blanton. The Count II wiretaps originated in an investigation which commenced at about the time the Count I wiretaps were installed and in which a Sergeant Stuart, the officer then in charge of gambling investigations for the San Mateo County, California, Organized Crime Unit, played a principal role. During the fall of 1971, Sergeant Stuart had contact from time to time with Agent Blanton and two other F.B.I. agents, Agents Hiner and Feeney.
 
 
 6
 Stuart's investigation developed as follows. On December 12, 1971, he accompanied a Captain Shaughnessy of the San Francisco Police Department when the Captain arrested Ronald Sacco and his girlfriend, Joanne Maloney, on an unrelated bookmaking charge. In an effort to infiltrate the bookmaking organization Stuart posed as a corrupt police officer and promised Sacco to "fix" the charges against Maloney. Agent Feeney was informed of these developments.
 
 
 7
 Stuart's efforts to infiltrate led to a discussion on January 10, 1972, between Sacco and him about the possibility of establishing gambling operations under Stuart's protection. This conversation bore fruit. On January 17, 1972, Stuart met with Sacco and appellant Attilio Spagnuolo. As a consequence of this meeting Stuart agreed with Spagnuolo to furnish protection for several telephones used in Spagnuolo's gambling operation for $300 a month. Stuart kept Agent Feeney informed of his progress.
 
 
 8
 Stuart's association with Spagnuolo continued and from January 17, 1972, to November 10, 1972, they had frequent meetings and conversations with regard to Stuart's protection of the gambling operation. Stuart reported to Agent Feeney on practically a daily basis. On November 10, 1972, the first of the Count II wiretaps, wiretap E, was installed and wiretaps F and G followed shortly thereafter. The application for these wiretaps utilized information derived primarily from Stuart's investigation.
 
 
 9
 An understanding of the present posture of this case requires that the circumstances surrounding its initial appeal be set forth. That appeal was from an order suppressing evidence derived from wiretap A and wiretaps E, F and G. At the suppression hearing, which resulted in the order from which the Government appealed, it was conceded that wiretap A was flawed because of Justice Department procedure deemed improper by this court's decision in United States v. Chavez, 478 F.2d 512 (9th Cir. 1973). This made necessary a determination of whether wiretaps E, F and G and their supporting affidavits were tainted. In the course of this inquiry the Government was ordered to produce certain investigative files of the F.B.I. The Government refused to produce the files. The magistrate presiding at the hearing thereupon excluded the testimony of several F.B.I. agents and, on the basis of the remaining testimony, held that the Government had failed to show that wiretaps E, F and G were not tainted. The district court approved the magistrate's order and the initial appeal was taken by the Government.
 
 
 10
 Prior to this court's disposition of the initial appeal, the Supreme Court reversed Chavez, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), and also in United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), held that Department of Justice procedures identical to those followed in authorizing the application for the authority to establish wiretap B were fatally defective. Relying on the Supreme Court's decision in Chavez, this court reversed the order suppressing the evidence derived from wiretap A. We also reversed the order suppressing the evidence derived from wiretaps E, F and G on the ground that the magistrate's order was contrary to the Jencks Act which prohibits court-ordered disclosure of statements of Government witnesses at a pre-trial suppression hearing. These positions required that we remand the case for further proceedings.
 
 
 11
 On remand appellants once more sought to suppress the evidence derived from each of the wiretaps. The Government made no contest with respect to wiretap B; Giordano took care of it. However, the Government resisted vigorously the suppression of evidence derived from each of the other taps. Appellants' position on remand and in this, the second, appeal is that the affidavits supporting wiretaps A, C, D, E, F and G did not comply with 18 U.S.C. § 2518(1) (c). The trial court rejected this position and denied the motion to suppress. It also refused to suppress evidence derived from wiretaps C, D, E, F and G and held that they were not tainted by the Giordano defect impairing wiretap B. It also refused to respond favorably to appellants' renewed effort to require disclosure of the F.B.I. investigative files relating to Counts I and II to show the existence of ineradicable taint.
 
 
 12
 The appellants appeal from the judgments of conviction. They assign these determinations as error. As already indicated, we affirm in part and reverse in part. Our discussion will be organized so as to respond to each of three grounds for appeal urged upon us by appellants.
 
 
 13
 II. Sufficiency of the Affidavits.
 
 
 14
 A. The Standard.
 
 
 15
 We turn first to the contention that the affidavits are insufficient. The standard which must be met appears in 18 U.S.C. § 2518(1)(c), which provides that each application for a wiretap authorization shall include:
 
 
 16
 a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.
 
 
 17
 The standard is reflected in 18 U.S.C. § 2518(3)(c), which provides that in issuing the order, the judge shall determine whether:
 
 
 18
 normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.
 
 
 19
 Appellants contend that the affidavits in support of the applications for the wiretaps inadequately describe why normal investigative procedures will be or have been unsuccessful or will be too dangerous in this case. They argue that the affidavits contain only boilerplate conclusions as to why normal investigative procedures will fail, which are based not upon the circumstances of this case but upon the Government's experience with other gambling operations. To authorize a wiretap on the strength of these generalizations, they insist, would make section 2518(1)(c) a nullity; every gambling operation would be susceptible to a wiretap without any showing as to the necessity of a wiretap for the investigation of the particular gambling operation in question.
 
 
 20
 They find support for their position in United States v. Kalustian, 529 F.2d 585 (9th Cir. 1975). There the court found the affidavits inadequate because of a failure to allege facts demonstrating why that particular case necessitated a wiretap.
 
 
 21
 In effect the Government's position is that all gambling conspiracies are tough to crack, so the Government need show only the probability that illegal gambling is afoot to justify electronic surveillance. Title III does not support that view.
 
 
 22
 Id. at 589.
 
 
 23
 Appellants assert that the affidavits before us should fare no better than those in Kalustian.
 
 
 24
 The Government, relying on this court's decisions in United States v. Kerrigan, 514 F.2d 35 (9th Cir.), cert. denied, 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975) and its progeny, United States v. Feldman, 535 F.2d 1175 (9th Cir. 1976), United States v. Turner, 528 F.2d 143 (9th Cir.), cert. denied sub nom., Grimes v. United States, 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975), and United States v. Sandoval, 550 F.2d 427 (9th Cir. 1976), argues that the affidavits meet the standard as interpreted in those cases and thus comply with section 2518(1)(c).
 
 
 25
 This is not a new type of dispute. Courts frequently compare affidavits before them with those failed by Kalustian and passed by Kerrigan. United States v. Anderson, 542 F.2d 428 (7th Cir. 1976); United States v. DiMuro, 540 F.2d 503 (1st Cir. 1976). Compare United States v. Adams, 536 F.2d 303 (9th Cir. 1976) and United States v. Pezzino, 535 F.2d 483 (9th Cir. 1976) with United States v. Smith, 519 F.2d 516 (9th Cir. 1975). These comparisons often lead to results difficult to harmonize. See United States v. Scully, 546 F.2d 255 (9th Cir. 1976) (Hufstedler, dissenting from rejection of en banc hearing); United States v. Matya, 541 F.2d 741 (8th Cir. 1976). Perhaps this is inevitable. In this case are several affidavits which contain allegations with varying degrees of specificity. We shall try once more to promulgate a manageable standard by which to judge affidavits under section 2518(1)(c) recognizing as we must that this statutory standard provides no sharp line, on each side of which will fall the good and the bad affidavits, but rather expresses an ideal. The extent to which a particular affidavit conforms to that ideal always will remain a matter about which good faith differences of opinion can exist.
 
 
 26
 We start by indicating that the common thread running through the Kerrigan line of decisions is that the affidavit, read in its entirety, must give a factual basis sufficient to show that ordinary investigative procedures have failed or will fail in the particular case at hand. This may be accomplished in various ways, including, but not limited to, descriptions of the particular illicit operation's peculiarities which necessitate a wiretap and of the heretofore unsuccessful investigatory efforts of the police. United States v. Feldman, 535 F.2d at 1178-79; United States v. Turner, 528 F.2d at 152; United States v. Kerrigan, 514 F.2d at 38. Kalustian does not conflict with this interpretation of section 2518(1)(c). An affidavit composed solely of conclusions unsupported by particular facts gives no basis for a determination of compliance with section 2518(1)(c). Kalustian teaches no more than that.
 
 
 27
 These decisions permit us to make the following observations. To show that "other investigative procedures have been tried and failed" the affidavit must reveal that normal investigative techniques have been employed in a good faith effort to determine the identity of those violating the law and to assemble sufficient evidence to justify their prosecution and that these efforts have failed to achieve their ends. The good faith effort need not have exhausted all possible uses of ordinary techniques. What is required is a showing that in the particular investigation normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time.[1]
 
 
 28
 Where such techniques have not been so employed the sufficiency of the affidavit depends on whether there is a showing that under the particular circumstances of the case the employment of such techniques "reasonably appear unlikely to succeed if tried or to be too dangerous." Any such showing requires setting forth an adequate factual history of the investigation and a description of the criminal enterprise sufficient to enable the district judge to determine, independently of an agent's assertions with respect to his or other agents' experiences, that ordinary investigative techniques very likely will not succeed or that their use will imperil life or in some other specific way be too dangerous. As previously indicated, an affidavit containing an unsupported assertion that general police experience indicates that ordinary investigative techniques "reasonably appear unlikely to succeed if tried or to be too dangerous" will not suffice. On the other hand, an affidavit is not insufficient because it did not prove beyond a shadow of doubt that ordinary techniques will fail or that their use will result in a loss of life or some equivalent disaster. The standard of reasonableness should be employed in measuring the affidavit against the statutory requirements.
 
 
 29
 It is no doubt true that experienced agents at the outset of an investigation can anticipate with a fair degree of accuracy whether ordinary techniques will fail or prove to be "too dangerous." To delay the wiretap order while ordinary techniques are employed or to undertake to educate a district judge to enable him to appreciate their level of experience no doubt appears to such agents as a waste of time and resources. Their perception may be accurate, but Congress has deprived it of decisive influence. The particularized showing here described is necessary. The district judge, not the agents, must determine whether the command of Congress has been obeyed.
 
 
 30
 B. Application of the Standard.
 
 
 31
 With this background, we turn first to Affidavit A and hold it does not comply with section 2518(1)(c). It contains no specific facts which would permit the district judge independently to determine whether the affidavit satisfies section 2518(1)(c). No investigatory efforts by any officer are disclosed; the affidavit merely contains an informant's description of gambling activities which transpire telephonically. Furthermore, the affidavit is devoid of allegations that show why in this particular gambling investigation ordinary investigative techniques will likely fail or be too dangerous. To allow such an affidavit to suffice will effectively deny the district judge his statutory role. The district court's denial of appellants' motion to suppress evidence derived under Wiretap A was erroneous.
 
 
 32
 Affidavit E[2] presents an entirely different case. Contained therein is a detailed description of Sergeant Stuart's nine-month investigation. Posing as a corrupt police officer, he successfully infiltrated the gambling organization to its highest level, yet he was unable to identify all the participants in the operation or to accumulate sufficient evidence to support all the elements of the offense. His investigation also revealed that these suspects operated in a manner that defied detection by ordinary means. They operated telephonically and were extremely wary of police activity as evidenced by their use of code names and their pattern of changing telephones. Furthermore, his visual surveillance of the principals had been fruitless. In addition to Sergeant Stuart's investigation, F.B.I. agents checked telephone records and watched appellant Attilio Spagnuolo's movements, but these efforts also were incapable of gathering sufficient evidence.
 
 
 33
 These facts demonstrate a good faith investigatory effort on the part of the Government. From these facts a district judge can independently determine that ordinary investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time. With these facts in hand, he need not rely upon the conclusions of an agent based on such agent's prior experiences.
 
 
 34
 Affidavits F and G do not differ significantly from Affidavit E. Our reasoning with respect to Affidavit E applies with equal force to them. The district court properly denied appellants' motion to suppress evidence obtained through Wiretaps E, F and G.
 
 
 35
 III. The "Taint" Problem.
 
 
 36
 A. The Statute.
 
 18 U.S.C. § 2515 provides that:
 
 37
 Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, . . . if the disclosure of that information would be in violation of this chapter.
 
 
 38
 This section codifies the "fruits of the poisonous tree" doctrine with respect to violations that trigger application of the section.[3] United States v. Giordano, 416 U.S. 505, 558, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) (Powell, J., dissenting); United States v. Wac, 498 F.2d 1227 (6th Cir. 1974).
 
 
 39
 Appellants make several arguments under this doctrine. We will address only two: first, whether the evidence derived under Wiretap A tainted the probable cause allegations contained in Affidavits C and D; and, second, whether the evidence derived from the Count I wiretaps tainted the probable cause allegations in the Count II affidavits.
 
 
 40
 B. Does A "Taint" C and D?
 
 
 41
 Summaries of conversations intercepted under Wiretap A form the essence of the probable cause allegations in Affidavits C and D. Furthermore, conversations intercepted under Wiretap A revealed the connection of the telephones tapped under Wiretaps C and D to the gambling ring. Any remaining untainted assertions in Affidavits C and D are of negligible significance. Therefore, A does "taint" C and D. Under 18 U.S.C. § 2515 evidence derived under Wiretaps C and D also should have been suppressed.
 
 
 42
 C. Do Count I Taps "Taint" Count II Affidavits?
 
 
 43
 Having held that no evidence derived from any of the Count I wiretaps was legally obtained, we must now decide whether Count I wiretap evidence tainted the probable cause assertions contained in the Count II affidavits. The results of Sergeant Stuart's investigation provided the probable cause for the Count II wiretaps. Appellants insist that the F.B.I. supplied Stuart with information derived from the Count I wiretaps which he then used in his investigation. We disagree. Viewing the evidence presented at the suppression hearings[4] in the light most favorable to the Government, United States v. Richards, 500 F.2d 1025 (9th Cir. 1974), cert. denied, 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975), we conclude that Stuart's investigation was untainted and that consequently the probable cause assertions in the Count II affidavits remain untainted.[5]
 
 
 44
 Although the three F.B.I. agents were in close contact with Stuart throughout his investigation, all four officers testified that there was only a one-way flow of information, Stuart to the F.B.I. The F.B.I. agents specifically denied passing any information obtained through the use of wiretaps to Stuart, with one unrelated exception.[6] Moreover, Stuart's superior, District Attorney Sorenson, warned Stuart to avoid any wiretap information because of its illegality under California law.
 
 
 45
 Appellants assert that Attilio Spagnuolo first came to Stuart's attention because of the Count I wiretaps. Stuart, however, knew of Spagnuolo's involvement in bookmaking before he suggested his name to Sacco. In fact, he suggested Spagnuolo to Sacco at the request not of the F.B.I. but of Captain Shaughnessy of the San Francisco Police Department.
 
 
 46
 The direct and circumstantial evidence adduced at the suppression hearings adequately supports the district court's ruling. The evidence derived under the Count II wiretaps was untainted and properly before the court.
 
 
 47
 IV. Disclosure of the F.B.I. Investigative Files.
 
 
 48
 Appellants argue that the district court should have ordered the Government to produce the F.B.I. investigative files on the ground that these files would demonstrate that the Stuart investigation was tainted. They do not seek disclosure under the Jencks Act; all Jencks Act statements were disclosed at trial. They suggest that disclosure should be required on the basis of either the constitutional right of compulsory process to obtain the appearance of witnesses or the disclosure requirements of Brady v. Maryland,373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
 
 
 49
 Their arguments are not well taken. Both assume that material indicative of a taint existed. No evidence in the record supports this assumption. Appellants have embarked upon the type of fishing expedition condemned by this court in Ogden v. United States, 303 F.2d 724 (9th Cir. 1962). The district court properly denied their motion. See Fed.R.Crim.P. 16(a)(2).
 
 
 50
 The judgment under Count I is reversed and remanded for further proceedings consistent with this opinion. The judgment under Count II is affirmed.
 
 
 
 [1]
 Nor must ordinary investigative procedures have been completely unsuccessful. They need only to have reached a stage where further use cannot reasonably be required. See United States v. Sandoval, 550 F.2d 427 (9th Cir. 1976); United States v. Scully, 546 F.2d 255 (9th Cir. 1976)
 
 
 [2]
 Our holding that Affidavit A does not comply with 18 U.S.C. § 2518(1)(c), coupled with our holding with respect to the taint issue, see Part III, infra, makes it unnecessary to pass on the merits of Affidavits C and D under section 2518(1)(c)
 
 
 [3]
 Congress clearly intended section 2518(1)(c) to act as a limitation on the use of wiretaps; thus, the remedy embodied in section 2515 applies to a violation of section 2518(1)(c). See United States v. Donovan, --- U.S. ----, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). See also United States v. Chun, 503 F.2d 533 (9th Cir. 1974)
 
 
 [4]
 The record of the first suppression hearing was incorporated into the second suppression hearing upon which this appeal is based
 
 
 [5]
 The Government argues that the only rights invaded by the Count I wiretaps were those belonging to Attilio Spagnuolo and Armando Cosenza. Consequently, only these two appellants have standing to use as a basis of their challenge to the Count II wiretaps the argument that the Count II wiretaps were the product of the Count I wiretaps. In view of our holding on the taint issue, we need not reach this question
 
 
 [6]
 Agent Blanton testified that he did give Stuart information about a liquor theft