577 F.2d 473
 UNITED STATES of America, Plaintiff-Appellee,
v.
Earl K. H. KIM, Sr., aka "The Old Man" and "E. K.",
Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ernest NAKAMURA, aka "Cincinnati", Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Joseph H. KAWAMOTO, aka "Lefty", Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sam KOBAYASHI, Defendant-Appellant (two cases).
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert R. MARTINEZ, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Joseph BARROZO, Jr., Defendant-Appellant.
 Nos. 76-3705, 76-3704, 77-1209, 76-3664, 76-3665, 77-2283
and 77-2320.
 United States Court of Appeals,
Ninth Circuit.
 Feb. 27, 1978.
Rehearing Denied in No. 76-3705 May 3, 1978.
 
 1
 Gordon M. Bronson (argued), Honolulu, Hawaii, Michael T. I. Kim (argued), of Kim & Kim, Honolulu, Hawaii, Thomas J. Bowers, III, John S. Edmunds, Ernest Y. Yamane, Honolulu, Hawaii, for defendants-appellants.
 
 
 2
 Michael L. Sterrett, Sp. Atty., San Francisco, Cal., Howard Chang, Honolulu, Hawaii, for plaintiff-appellee.
 
 
 3
 Appeals from the United States District Court for the District of Hawaii.
 
 
 4
 Before ELY and CHAMBERS, Circuit Judges, and LINDBERG,* District Judge.
 
 LINDBERG, District Judge:
 
 5
 This opinion involves seven appeals from the United States District Court for the District of Hawaii which have been consolidated for argument and disposition. Each appellant has been found guilty of illegal gambling or conspiracy or both resulting from either a jury trial or a court trial on stipulated facts. All issues raised in these appeals are resolved in favor of the Government. The judgments entered against the various appellants are affirmed.
 
 
 6
 On September 12, 1975, Department of Justice Attorney Sterrett applied to Judge King for an order authorizing the interception of wire communications. This application, its supporting documentation, and the resulting wiretap order were designated "DH-5". Exhibit A to the DH-5 application consisted of two documents also dated September 12, 1975. One was a copy of a memorandum signed by Attorney General Levi to Assistant Attorney General Thornburgh authorizing an application to a federal court for an order permitting the interception of communications over telephone number 947-7679. The other was a copy of a letter from Thornburgh's Deputy Chief in Washington D.C. to Kotoske, the attorney in charge of the San Francisco Strike Force informing Kotoske of the contents of the Attorney General's memorandum. Exhibit B to Sterrett's DH-5 application was a twenty-four page affidavit by F.B.I. Special Agent Tanaka which sought to establish why a wiretap was necessary in the illegal gambling investigation at hand. The bulk of Tanaka's affidavit consisted of detailed recitations of what various F.B.I. and Honolulu Police Department (hereafter H.P.D.) officers had told Tanaka concerning conversations they had with three confidential informants. According to the DH-5 affidavit, the informants had generally not relayed incriminating information to Tanaka. The affidavit also detailed corroborating information obtained through surveillances and investigations of telephone company records. On the same day, Judge King signed an order authorizing the requested wiretap for not longer than twenty days.
 
 
 7
 A similar application, denominated "DH-6" was again presented to Judge King on October 2, 1975. This time a wiretap on phone number 732-3588 as well as an extension of the DH-5 order was requested. Again, Sterrett's application was supported by a copy of the Attorney General's authorization, a copy of the letter informing the San Francisco Strike Force of the preliminary authorization to proceed, and a lengthy affidavit by Tanaka all of even date with the DH-6 application. Judge King signed the DH-6 order the morning of October 2, 1975.
 
 
 8
 By the second week of October, 1975, Judge Wong had signed and issued numerous search warrants which were executed shortly thereafter. In December, 1975, a federal grand jury issued two indictments. One dealt with an illegal bookmaking operation. The other concerned a sports pool, parley card gambling business.
 
 
 9
 Of the six appellants, three of them (Kim, Kawamoto, and Nakamura) were convicted by a jury after a trial with five other defendants of conspiracy and bookmaking. 18 U.S.C. §§ 2, 37, 1955 (1970). Pursuant to stipulated facts, two of the appellants (Martinez and Barrozo) were found guilty by the court of operating a sports pool, parley card business. 18 U.S.C. §§ 2, 1955 (1970). Only appellant Kobayashi was indicted for both bookmaking (No. 76-3664) and operating an illegal sports pool (No. 76-3665). The court found Kobayashi guilty of both substantive charges on the basis of stipulated facts.
 
 I. SUPPRESSION OF THE WIRETAP EVIDENCE
 
 10
 At the time of trial, numerous telephone conversations[1] were admitted against Kim, Nakamura and Kawamoto. They, as well as Martinez and Barrozo, challenged the lower court's denial of motions to suppress the conversations on the ground that the DH-5 application did not include a "full and complete statement" of need as required by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2518(1)(c) (1970).[2] They maintain that the DH-5 affidavit consisted of general assertions and conclusions similar to those held insufficient in United States v. Kalustian, 529 F.2d 585 (9th Cir. 1975).[3]
 
 
 11
 Tanaka's DH-5 affidavit states that the investigation of the target gambling operations had begun four months prior to the Government's request before Judge King. During June, July, and August, 1975, H.P.D. personnel conducted extensive surveillances and gathered information on a number of suspects. Much of this information was obtained through numerous H.P.D. contacts with Confidential Informants Nos. 1 and 2. The H.P.D. then passed on to Tanaka the details of conversations in which incriminating information was disclosed by the informants. Also contained in Tanaka's affidavit was the substance of information on illegal gambling which had been provided to the F.B.I. by Confidential Informant No. 3. The modus operandi described by the various informants conformed to the pattern already revealed by the Government's surveillance efforts and searches through telephone company records. The DH-5 affidavit disclosed the existence of a sizeable gambling enterprise conducted through a central telephone location which, in an attempt to avoid detection, had been moved three times.
 
 
 12
 Tanaka's affidavit was sufficiently detailed to avoid the pitfalls noted in Kalustian. The Government in the instant case adequately complied with the requirement that other investigative procedures be tried and fail prior to asking for permission to intercept wire communications. As we have recently held,
 
 
 13
 (t)o show that "other investigative procedures have been tried and failed" the affidavit must reveal that normal investigative techniques have been employed in a good faith effort to determine the identity of those violating the law and to assemble sufficient evidence to justify their prosecution and that these efforts have failed to achieve their ends. The good faith effort need not have exhausted all possible uses of ordinary techniques. What is required is a showing that in the particular investigation normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time.[4]
 
 
 14
 The trial court committed no error in denying the appellants' attempt to suppress the recorded evidence derived from the wiretaps in these cases.
 
 II. ACCESS TO GRAND JURY TESTIMONY
 
 15
 Appellant Kim alleges error in the lower court's denial of his motion requesting permission to review the entire transcript of the grand jury proceedings which resulted in his indictment on bookmaking charges. In support of this motion, Kim submitted the affidavits of Fong, Tominaga, and Komoto who all deny having made statements attributed to them by the DH-5 informants.[5] On this basis, Kim asserts that the court should have allowed him to acquire supporting evidence for his argument that the Government fabricated its informants by lifting the veil of grand jury secrecy.
 
 
 16
 Kim's position is without merit. Under Dennis v. United States,384 U.S. 855, 870-71, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), the standard of particularized need is narrowly applied to insure that only relevant grand jury testimony is made available to defense counsel. Dennis does not sanction across the board fishing expeditions by defense counsel who, under the Jencks Act, 18 U.S.C. § 3500 (1970), are entitled to the pretrial statements of Government witnesses at the time of trial.[6] As to Kim, the Government more than fulfilled its obligation by voluntarily furnishing prior statements, including grand jury testimony, of its anticipated witnesses well before the trial had even begun.
 
 
 17
 III. THE RIGHT TO EITHER AN IN CAMERA HEARING OR TO CONFRONT
 
 INFORMANTS
 
 18
 Next, appellant Kim alleges error in the trial court's denial of his motion to produce the informants mentioned in the DH-5 affidavit, and his motion for an in camera hearing to test the existence and reliability of those informants. Kim argues that, if he was not entitled to production of the informants as a matter or right,[7] then at least the court should have conducted an in camera hearing on whether the three DH-5 informants actually existed. The right to such a hearing, it is argued, arose by virtue of the appellant's submission of the three counter-affidavits noted above.[8]
 
 
 19
 We disagree. Disclosure of the identity of informants is required only if such information is "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." Roviaro v. United States,353 U.S. 53, 60-61, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957). The accused's burden of proving such need[9] is not met by merely raising a suspicion that informants might be helpful in the preparation of a defense. United States v. Marshall, 526 F.2d 1349, 1359 (9th Cir. 1975), cert. denied, 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 376 (1976). Rather, the decision to disclose
 
 
 20
 depends upon the particular facts in each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony and other relevant factors. . . . (W)e emphasize that this circuit is firmly committed to the dogma that in balancing the interest of the government against that of the accused, the burden of proof is on the defendant . . . . Indeed, a defendant who seeks the name of (an) informer . . . has the burden of showing that disclosure would serve a necessary or useful purpose and where defendant does not sustain this burden, there is no abuse of discretion in refusing to require disclosure.
 
 
 21
 United States v. Alvarez, 472 F.2d 111, 113 (9th Cir. 1973) (citations omitted). No abuse of discretion was present in denying Kim the chance to test the existence and reliability of the Government's informants either directly or indirectly. Prior to trial, the appellant fully cross-examined the DH-5 affiant, Tanaka, concerning the substance of his sworn statement. Kim offered three rebuttal affidavits whose reliability and probative value were challenged by the United States.[10] Even assuming the truth of Kim's documents, they merely established, at most, that either the DH-5 informants intentionally mislead H.P.D. officers or that the latter mislead Agent Tanaka. Neither case would be sufficient to destroy the original probable cause upon which the DH-5 order was based, United States v. Damitz, 495 F.2d 50, 55-56 (9th Cir. 1974), or to justify a ruling on appeal that the lower court clearly abused its discretion in denying Kim's request for either the production of informants[11] or an in camera hearing. United States v. Marshall, 526 F.2d 1349, 1359 (9th Cir. 1975); United States v. Anderson, 509 F.2d 724, 729-30 (9th Cir.), cert. denied, 420 U.S. 910, 95 S.Ct. 831, 42 L.Ed.2d 840 (1975); see United States v. Carmichael, 489 F.2d 983, 988-89 (7th Cir. 1973).
 
 
 22
 IV. THE SEARCH OF BARROZO'S HOUSE AND VEHICLE
 
 
 23
 On the morning of October 11, 1975, two F.B.I. agents and two H.P.D. officers arrived at Barrozo's residence with a search warrant signed on the previous day by Judge Wong. A search of the residence for bookmaking records and wagering paraphernalia had been authorized between the hours of 6:00 a.m. and 10:00 p.m. Barrozo was awakened by loud knocking at the front door and was informed that F.B.I. agents sought admittance. After asking whether he could change clothes before opening the door, Barrozo was told that the door would be broken down unless he opened it immediately. Three of Barrozo's children were present at the time of this exchange.
 
 
 24
 The search produced thirteen items of evidence consisting of football cards, betting sheets, and the like which, except for two items, were located throughout Barrozo's home. Items twelve and thirteen, however, were seized from Barrozo's van which was parked in the driveway. At a pretrial suppression hearing, Barrozo testified that he had signed a form giving consent to the van search after Special Agents Gonzalez and Lonergan had already conducted the search. The agents, on the other hand, testified that Barrozo's permission had been obtained before the search. They said that Barrozo consented after he was told that the search warrant did not cover the vehicle and that he had a constitutional right to withhold consent.
 
 
 25
 Barrozo argues that the trial court erred in admitting items twelve and thirteen because either he did not consent to the van search until after the fact or he did not freely consent. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); United States v. Page, 302 F.2d 81 (9th Cir. 1962). Barrozo also maintains that all thirteen items should have been suppressed under Fed.R.Crim.P. 41(c)[12] for failure to comply with the time limitations of the warrant thereby making the entire search illegal. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
 
 
 26
 First, we hold that none of the evidence from Barrozo's home or van was the fruit of an illegal search. In viewing the evidence presented at the suppression hearing in the light most favorable to the Government,[13] we find substantial evidence to support the "trial court's refusal to suppress on the grounds of (an) assertedly defective execution of the warrant."[14] The agents testified that, after communicating with a central coordinator, they proceeded to Barrozo's front door. They knocked twice and were shortly thereafter allowed to enter by the appellant. As they entered, Barrozo was given an Advice of Rights form which was received and signed by him at 6:00 a.m. and 6:02 a.m.[15] The record contains substantial evidence supporting Judge King's rejection of the assertion that the warrant was prematurely executed.
 
 
 27
 Second, the record supports a finding that Barrozo freely and voluntarily consented to the search of his van.[16] Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In Schneckloth, the Supreme Court held that "voluntariness" presented a factual question to be determined from the "totality of the circumstances." Id., at 227, 248-49, 93 S.Ct. at 2047. Nothing in the circumstances reflected in the record of Barrozo's case indicates that error was committed below in admitting items twelve and thirteen.
 
 
 28
 V. THE PRETRIAL VOICE IDENTIFICATION PROCEDURES
 
 
 29
 Nakamura and Kawamoto claim that they were entitled to have counsel present at pretrial voice identifications made by Government witnesses.[17] The appellants contend that such an identification is a critical stage to which the pretrial lineup requirements of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), would apply.
 
 
 30
 We disagree. Pretrial identifications by Government witnesses of voices obtained through lawful electronic surveillance are not, for Sixth Amendment purposes, critical stages of the criminal proceeding in which the witnesses are to eventually testify. See United states v. Ash, 413 U.S. 300, 321, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973); accord, United States v. James,161 U.S.App.D.C. 88, 106, 494 F.2d 1007, 1025, cert. denied, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). In Ash, the Supreme Court characterized the events to which the Sixth Amendment counsel guarantee attached as those in which "the accused require(s) aid in coping with legal problems or assistance in meeting his adversary." United States v. Ash, 413 U.S. 300, 313, 93 S.Ct. 2568, 2575, 37 L.Ed.2d 619 (1973). Nakamura and Kawamoto have not advanced, nor can we decipher, any constitutionally significant difference between post-indictment identifications based on recorded images and those based on recorded sounds.
 
 
 31
 Appellants Nakamura and Kawamoto also contend, as does Kim, that the pretrial voice identifications were too suggestive and that the trial court erred in denying their motions to strike the testimony of the Government's voice identification witnesses. The appellants' claim of denied due process arises from the fact that the F.B.I. agent who conducted the voice identifications generally asked each of the Government's potential witnesses, before the witness had an opportunity to listen to any tape, whether the witness could identify a particular defendant. The witness was then requested to identify the voice of the specified defendant as a tape was being played. The appellants contend that this procedure constituted impermissible prompting by the Government. Cf. United States v. Trivette, 284 F.Supp. 720, 722-23 (D.D.C.1968). Further, the appellants point out that the tape which was used to identify Kim's voice contained, with one or two exceptions, fourteen consecutive conversations to which Kim was a party. In total, the Kim tape was a composite of forty or so conversations. The appellants claim that this type of procedure, coupled with an inquiry as to whether a particular defendant could be recognized, is analogous to the practice, condemned in Palmer v. Peyton, 359 F.2d 199 (4th Cir. 1966), of identifying suspects singly instead of in a lineup. Cf. Stovall v. Denno, 388 U.S. 293, 301-02, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).[18]
 
 Recently, we stated that:
 
 32
 No litmus paper test is available to evaluate the constitutional adequacy of the identification procedures used in any particular case. Rather, as stated by the Supreme Court in Neil, (Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)), the "central question (is) whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." 409 U.S. at 199, 93 S.Ct. 375. . . . This is, in essence, the test used by this Court in evaluating challenges to identification procedures. United States v. Baxter, 492 F.2d 150 (9 Cir. 1973), cert. denied, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). The Supreme Court decision in Neil and our decision in Baxter enumerate a number of factors to be considered in evaluating the "totality of the circumstances" of a specific case. . . . Although not all of the factors mentioned in Baxter apply to the identification of a tape-recorded voice, the general approach and the policy considerations (of photographic identifications) are essentially the same. Baxter establishes a broad two-part analysis, the first part focusing on the necessity for the . . . identification and the second on the particular circumstances surrounding the identification.
 
 
 33
 United States v. Pheaster, 544 F.2d 353, 369-70 (9th Cir. 1976), cert. denied, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977). There is no question that some type of streamlined identification procedure was necessary for the Government to prepare its case.[19] The trial involved eight defendants in an intricate gambling conspiracy. During the course of the investigation, literally thousands of recorded conversations had been accumulated by the F.B.I.; approximately 116 of which were admitted against the various defendants through the use of composite tapes, corresponding transcripts, and witness voice identifications lists. Admittedly, the element of urgency which the Government relied on in the voice identification in Pheaster is not present here. However, we do not find the circumstances presented in the instant appeal any less compelling, in their own way, than those which confronted the Government during its attempts to rescue the Pheaster kidnap victim. An interest in quick and effective action by law enforcers controlled the latter situation, whereas the concern for an accurate and logical consolidation of a mass of evidentiary data, essential to the expedient prosecution of a complex criminal conspiracy, controls the former. In each instance, the Government had no practical or reasonable alternative but to expose its voice witnesses to recorded conversations prior to trial. Further, while preferable identification procedures may, in some instances, have been available, we are convinced that the ones actually used by the Government in this case fell short of being unconstitutional.[20] However suggestive some of the pretrial sessions may have been, there is little, if any, indication that any voice witness in this case was "manipulated so that the mental image derived from the identification procedure supplant(ed) that derived from the witness's own experience." United States v. Pheaster, supra, 544 F.2d at 370-71.
 
 VI. THE IMPEACHMENT ISSUE[21]
 
 34
 Appellant Kim also raises the issue of whether the minimization provision of the DH-5 intercept order was violated by the Government's introduction of a recorded conversation for the purpose of impeaching Kim's witness, Dr. Dang.[22] On direct, Dang testified that, as a long time acquaintance of Kim's, he was familiar with Kim's voice. Dang testified that he could not identify Kim's voice in six intercepted calls in which the government had attempted to establish Kim was a speaker. On cross-examination, another conversation was offered into evidence in which both Kim and Dang were speakers. When questioned as to this tape, Dang said that he did not recognize his own voice although he did remember the conversation as one he had at some point with Kim. Contrary to the assertions of Kim's counsel on appeal, the conversation at issue went beyond the realm of mere chatter about bridge to include a discussion on bet cancellations.
 
 
 35
 Assuming, without deciding, that Section 2518(10)(a)'s pretrial motion requirement was fulfilled, we are persuaded by the Government's argument that no statutory ground for suppression was presented to justify the exclusion of the Kim-Dang tape.[23] Cf. Harris v. New York, 401 U.S. 222, 226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); United States v. Smith, 538 F.2d 1359, 1362-63 (9th Cir. 1976).
 
 
 36
 VII. THE CHARGES OF PREJUDICIAL CONDUCT BY THE TRIAL COURT
 
 
 37
 Appellants Kim, Nakamura, and Kawamoto allege that they were denied a fair trial because the Government, in its opening statement, and the trial judge, in his closing instructions, read the entire eighteen person indictment to the jury. Only eight of those indicted for bookmaking were actually tried before a jury. At the time, no objections were raised to either mention of the additional ten defendants. Moreover, the judge twice cautioned the members of the jury that the indictment, itself, did not constitute evidence to be considered in their deliberations. As the appellee correctly points out, an abundance of proof was presented tending to incriminate the defendants who chose not to stand trial as well as those who did. The appellants' contention, therefore, that they were prejudiced by being tried with too many defendants is baseless.
 
 
 38
 We find no abuse of discretion in the trial court's decision to permit the jury to hear the entire indictment. United States v. Polizzi, 500 F.2d 856, 876 (9th Cir. 1974), cert. denied, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975).
 
 
 39
 Kim,[24] Nakamura, and Kawamoto also assert that the trial judge committed reversible error during his comments on the evidence.[25] The appellants point to the court's suggestion that the only factual issue which would be difficult to determine seemed to be the question of whose voices were present on the wiretap tapes. The appellants feel that there also remained the factual question whether the Government established $2,000 or more in gross gambling revenues[26] per day. No objection was raised by the appellants during or after the alleged prejudicial comments by the court.
 
 
 40
 Accordingly, the standard to be applied on review is whether the court's remarks constituted plain error under Fed.R.Crim.P. 52(b). We hold that they did not. A trial court's inaccurate factual summary to the jury may amount to reversible error. United States v. Jacobo-Gil, 474 F.2d 1213, 1216 (9th Cir. 1973). However, the issue which the appellants claim was improperly taken from the jury was, in reality, the legal issue whether the term "gross revenue" included credit bets, i. e., those which had been placed but not yet paid. United States v. Sacco, 491 F.2d 995, 1001 (9th Cir. 1974). Further, the court conscientiously instructed the jurors that his comments on the evidence could be disregarded by them since it was their function to determine the facts of the case. No error was present in Judge King's remarks on the evidence.
 
 
 41
 Affirmed.
 
 
 
 *
 The Honorable William J. Lindberg, Senior United States District Judge, Seattle, Washington, sitting by designation
 
 
 [1]
 The record reveals that in excess of 2,500 telephone conversations were recorded by the Government which required identification prior to trial. About 116 calls were admitted at the jury trial
 
 
 [2]
 Each application for an order authorizing or approving the interception of wire communications must include:
 a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.
 18 U.S.C. § 2518(1)(c) (1970). From such a statement, the judge issuing the order is required under 18 U.S.C. § 2518(3)(c) (1970) to determine whether:
 normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . .
 Appellant Kobayashi attacks the wiretap applications by arguing that a facsimile or likeness of the Attorney General's signature is insufficient to allow an intercept order. Second, he asserts that the DH-5 application was made in advance of the actual receipt of the Attorney General's authorization to attempt to obtain a wiretap. In view of the fact that the Attorney General's authorization was transmitted by Magnafax from Washington, D.C. to San Francisco and then hand carried on a plane from there to Hawaii, it is clear that Kobayashi's latter assertion results from the appellant's confusion concerning the operation of time zones between the east coast and Hawaii.
 As to the contention that the original authorization by the Attorney General must accompany a wiretap application, we first note that 18 U.S.C. § 2518(1)(a) (1970) merely requires that such applications include "the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application." The purpose of this requirement is to insure that the individual who approves a request to apply for an electronic surveillance order will ultimately bear the responsibility for the initial authorization. United States v. Chavez, 416 U.S. 562, 571-72, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). Although the original memoranda accompanying an application would suffice, we decline to hold that it is required where, as here, the assertion of improper authorization was fully explored and rebutted prior to trial, United States v. Vento, 533 F.2d 838, 859-60 (3d Cir. 1976), and the party raising the point on appeal had previously stipulated that the applications at issue had been properly approved in advance by the Attorney General.
 
 
 [3]
 In Kalustian, we noted that
 (t)he affidavit (supporting the Government's application for an intercept order) does not enlighten us as to why this gambling case presented any investigative problems which were distinguishable in nature or degree from any other gambling case. In effect the Government's position is that all gambling conspiracies are tough to crack, so the Government need show only the probability that illegal gambling is afoot to justify electronic surveillance. Title III does not support that view.
 United States v. Kalustian, 529 F.2d 585, 589 (9th Cir. 1975).
 
 
 [4]
 United States v. Spagnuolo, 549 F.2d 705, 710 (9th Cir. 1977) (footnote omitted); accord, United States v. Alfonso, 552 F.2d 605, 612 (5th Cir. 1977)
 
 
 [5]
 According to Tanaka's DH-5 affidavit, Informant No. 2, a bookmaker, had told H.P.D. Officer Campbell that the informant had placed various bets with Fong during 1975 and that Fong was tied into Kim's gambling operation. Tanaka was then informed of these admissions through Campbell. Fong's affidavit denied ever receiving such bets or, otherwise being involved with Kim or his runners. The government attempted to impeach Fong's denials by pointing to the fact that his common law wife was a defendant in a companion gambling prosecution
 Tominaga's affidavit similarly denied making incriminating statements to Informant No. 1 which were then passed on to Tanaka through H.P.D. Sergeant Chang. The Government countered those denials by stressing the fact that the affiant had recently been arrested by local authorities as an illegal gambling suspect. Komoto's statement made similar denials, however, the Government correctly points out that, despite numerous opportunities to do so, Komoto failed to ever execute his "affidavit."
 
 
 [6]
 18 U.S.C. § 3500(a) (1970) states that:
 In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.
 As used in Section 3500(a), the term "statement" includes statements made by a witness before a grand jury. 18 U.S.C. § 3500(e)(3). As to statements or reports made by the defendant, see the discovery provisions of Fed.R.Crim.P. 16(a)(1)(A).
 
 
 [7]
 United States v. Alvarez, 472 F.2d 111, 113 (9th Cir.), cert. denied, 412 U.S. 921, 93 S.Ct. 2742, 37 L.Ed.2d 148 (1973)
 
 
 [8]
 See discussion note 5 supra
 
 
 [9]
 United States v. Marshall, 532 F.2d 1279, 1282 (9th Cir. 1976); United States v. Estrada, 441 F.2d 873, 879 (9th Cir. 1971)
 
 
 [10]
 See discussion note 5 supra
 
 
 [11]
 United States v. Marshall, 532 F.2d 1279, 1282-83 (9th Cir. 1976); United States v. Marshall, 526 F.2d 1349, 1359 (9th Cir. 1975)
 
 
 [12]
 Fed.R.Crim.P. 41(c)(1) provides in part that
 (t)he warrant shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime.
 "Daytime" under Rule 41 means "the hours from 6:00 a.m. to 10:00 p.m. according to local time." Fed.R.Crim.P. 41(h).
 
 
 [13]
 United States v. Spagnuolo, 549 F.2d 705, 712 (9th Cir. 1977); United States v. Richards, 500 F.2d 1025, 1026 (9th Cir. 1974), cert. denied, 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975); United States v. Hood, 493 F.2d 677, 680 (9th Cir.), cert. denied, 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974)
 
 
 [14]
 Johnson v. United States, 506 F.2d 640, 644 (8th Cir. 1974), cert. denied, 420 U.S. 978, 95 S.Ct. 1404, 43 L.Ed.2d 659 (1975)
 
 
 [15]
 Barrozo testified that about five minutes lapsed between the entrance of the police and his signing of the Advice of Rights form. Record, vol. 3, at 36. On direct, Gonzalez said that he had been at the premises for "(a) pproximately no more than five minutes" when Barrozo had signed the Advice of Rights form. Record, vol. 3, at 15. On cross examination, however, Gonzalez testified that the form was handed to Barrozo at 6:00 a.m. and that it was signed at 6:02 a.m. (Record, vol. 3, at 23) thereby suggesting that the search had commenced too early. At the same time, Gonzalez once indicated that his initial entry into the home was "approximately six o'clock" (Record, vol. 3, at 21) and that he had been at Barrozo's door for about two minutes before it was opened and that thereafter Barrozo signed the Advice of Rights form "(w) ithin a period of five minutes, somewhere in that area of time." Record, vol. 3, at 22-23
 
 
 [16]
 We are cognizant of the conflict between Barrozo's uncorroborated testimony that he consented to the van search only after the fact (Record, vol. 3, at 38-39) and Agent Gonzalez's testimony that Barrozo's consent was obtained prior to the search. Record, vol. 3, at 24. Unlike the court which conducted the suppression hearing, this court is not in a position to determine the credibility of witnesses or choose which version of a disputed incident accurately represents the facts. Accordingly, the trial court's finding in this regard will not be disturbed
 
 
 [17]
 The record reveals that agent Bramley, the overall case agent for the investigation, testified that the automatic recording devices of the F.B.I. recorded over 40 reels of tape from the first wiretap alone. For both DH-5 and DH-6, a total in excess of 2,500 conversations were recorded. Each recorded conversation simultaneously triggered the recording of the time through a connection with an independent telephone company line. Bramley made various composite tapes of conversations which he selected for different purposes. One such tape was prepared to show the general scope and nature of the gambling business. Others contained conversations for the purpose of identifying or proving the guilt of one or another of the defendants. Bramley testified that for each of the composite tapes, he prepared and proofread a corresponding transcript upon which he noted the date and time of each call, and the identities of speakers he recognized. Whether a call was ingoing or outgoing was also noted on the transcripts this information was available through, among other means, the use of pen registers. Bramley then produced duplicate transcripts from which he omitted the names of persons who he had previously identified
 The week prior to trial, Bramley and/or Agent Tanaka furnished copies of Bramley's duplicate transcripts to prospective voice identification witnesses for the Government. These transcripts were read by the witnesses while they listened to the appropriate tape. However, prior to listening to a tape, the witness was usually asked whether he could identify the voice of a particular defendant. The witness was then requested to indicate which of the various voices on a composite tape he could identify while at the same time again proofreading the transcript. As he listened to a tape, each prospective witness made a list of the calls and voices which he could identify. Further, except for one instance, the various witnesses listened to their tapes out of the presence of other possible Government witnesses.
 During trial, each voice identification witness was questioned regarding the foregoing procedure as to him. Minor variations were revealed among the witnesses but, overall, the steps taken by the Government remained standard throughout. The witness was then questioned as to his list of identifications which was then read into the record. In all, four witnesses were presented by the Government to identify Kim's voice. Three each took the stand to identify the voices of Nakamura and Kawamoto.
 
 
 [18]
 We are aware of the appellants' assertion that there was a "communal session" in which identification witnesses would call out when they recognized a voice during the playing of a composite tape. Our examination of the record reveals that the appellants' interpretation of Officer Campbell's testimony in this regard is, at best, misleading. The incident merely involved an isolated instance in which Agent Bramley replayed (three times) a portion of one of the tapes to Officer Campbell in the presence of either or both of the other two H.P.D. officers who were used to identify Nakamura's voice. Bramley did so to make sure that Campbell was convinced that the voice was Nakamura's since Bramley had previously identified the speaker as Kobayashi. There was, however, no suggestion of the speaker's identity made to Campbell by Bramley or anyone else. Record, vol. 9, at 468-73
 
 
 [19]
 See note 17, supra
 
 
 [20]
 Of the four witnesses called at trial to identify Kim's voice, Agent Bramley of the F.B.I. actually met and talked to Kim only after hearing a certain voice later identified by Bramley as Kim's hundreds of times on replays of various wiretap recordings. Detective Irvine (H.P.D.) also identified Kim's voice before trial. Irvine recognized Kim as a participant in fifteen out of nearly a hundred calls which were played for Irvine by Bramley. At the time, Irvine was unaware of the pending case and he was merely asked if he would listen to certain tapes to see if he could identify any of the speakers. Before listening to the Government's tapes, Captain Nakaganeku (H.P.D.), the third witness to identify Kim's voice, was asked by both Bramley and Sterrett if Nakaganeku could identify Kim's voice. Out of about thirty conversations, Nakaganeku identified Kim as a participant fourteen times without the assistance or prompting of either Bramley or Sterrett. Finally, H.P.D. Detective Rezentes was also asked by Bramley whether he could identify Kim's voice before he was played nearly fifty conversations. Rezentes thought he heard Kim in fourteen which the appellants point out were arranged, for all practical purposes, in consecutive order
 On cross-examination, one of the three witnesses who identified Nakamura's voice H.P.D. Officer Campbell testified that, before listening to the tapes, he had not been told whose voices to expect. However, Campbell admitted that he assumed Nakamura's voice would be present even though he felt that Nakamura's voice would have been recognizable without such an assumption.
 The foregoing indicates situations all inherently less suggestive than the Pheaster identification which involved only one recorded voice and only one police officer who, before listening to the tape, was asked whether he knew and could identify the voice of a particular individual.
 
 
 [21]
 In passing, we note the assertion by appellant Kim that the trial court erroneously denied the motion of counsel for a co-defendant, Wong, to conduct an in court experiment for the purpose of impeaching the Government witnesses (Kawamura, Chang, and Aio) who identified Wong's voice. None of these witnesses offered testimony for the purpose of identifying Kim's voice. First, we fail to perceive in the record the asserted understanding that all defendants joined together in all motions. Second, even assuming that Kim's trial counsel had standing to object to the exclusion of evidence which would have impeached testimony admitted only against a co-defendant, it is obvious that the experiment proposed by Wong's attorney would have had no probative value regarding any factual issue bearing on the guilt or innocence of Kim. Finally, the record supports the appellee's position that even if Kim's attorney had properly objected to the denial of Wong's proposed experiment, no abuse of discretion inhered in the trial court's ruling in view of the manifest dissimilarity between the voice identifications proposed by Wong's counsel and those which had been conducted by the Government prior to trial
 
 
 [22]
 Interception orders under 18 U.S.C. § 2518(5) (1970) must:
 contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception . . . and must terminate upon attainment of the authorized objective, or in any event in thirty days.
 
 
 [23]
 Under 18 U.S.C. § 2518(10)(a) (1970) an aggrieved person in a court proceeding may move to suppress the contents of any intercepted communication on the grounds that either the interception was unlawful, the authorizing order was defective, or the interception was not made in compliance with the court order. Such a motion, however, is required to be made prior to trial "unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion." Although Kim filed a pretrial suppression motion in which violation of the intercept order's minimization provisions was alleged, we note that no mention of that basis for suppression was present in either the supporting memorandum or the oral argument of trial counsel
 
 
 [24]
 In addition, Kim alleges reversible error in the court's comments to his trial counsel. Our review of these scattered incidents which appear briefly throughout the massive reporter's transcript in this case convinces us that the court acted, at all times, properly notwithstanding the sometimes trying, if not tiresome, antics of Mr. Schutter. Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933); accord, United States v. Harris, 501 F.2d 1, 10-11 (9th Cir. 1974)
 
 
 [25]
 During closing instructions, the court addressed the jury in part as follows:
 First of all, the law of the United States permits the Judge to comment to the jury on the evidence in the case. Such comments are only expressions of the Judge's opinion as to the facts, and the jury may disregard them entirely . . ..
 It seems to me that all counsel have directed your attention to really the only issue which should give you any pause in your deliberations, and that is the identity of each individual claimed to be on the tapes. . . . (T)here doesn't seem to be much doubt that somebody was carrying on a bookmaking operation . . ..
 It also seems from the evidence again, as I say, I'm only giving you my reaction to it that there are certainly at least five people involved . . ..
 Record, vol. 13, at 1692-94.
 
 
 [26]
 18 U.S.C. § 1955 (1970)